UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MARCUS JAMAR WADE,**

   **Plaintiff,**

v.                 **Case No. 18-cv-110**

**C.O. PAYNE, et al.,**

   **Defendants.**

---

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

Plaintiff Marcus Jamar Wade, a Wisconsin inmate representing himself, brings this lawsuit under 42 U.S.C. § 1983. (Docket # 1.) Wade alleges that the defendants violated his Fourteenth Amendment rights by providing inadequate medical care. (*Id.*) Before me are the defendants' motions for summary judgment.[1] (Docket # 34, Docket # 40.) For the reasons explained below, I will grant the motions.

### RELEVANT FACTS[2]

*1. The Parties*

At all times relevant to this case, Wade was a pre-trial detainee at the Milwaukee County Jail. (Docket # 1 at ¶ 1.) The Correctional Officer Defendants—Payne,[3] Jeffrey

---

[1] The defendant employees of Milwaukee County filed a joint motion for summary judgment. (Docket # 40.) Defendant Brandon Decker, who is not employed by Milwaukee County and is represented by separate counsel, filed separately. (Docket # 35.)

[2] The facts are primarily taken from the Correctional Officer Defendants' Proposed Findings of Fact (Docket # 41-1) and Decker's Proposed Findings of Fact (Docket # 35) as well as Wade's responses to both sets of proposed findings of fact (Docket # 57, Docket # 58), Wade's complaint (Docket # 1), and Wade's deposition ("Deposition Tr.," Docket # 49-3). The Correctional Officer Defendants argue that Wade offers no admissible evidence, not even a declaration, to support his case. (Docket # 61 at 2.) However, Wade states in his complaint and responses that he declares under penalty of perjury that the contents are true and correct. (Docket # 1 at 8; Docket # 57 at 6; Docket # 58 at 16.) This is enough to convert these submissions into affidavits for purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011).

Ericson, Brian Dragoo, Tonaya Hintz, Vincente Santana, Derrick Spidell, Nancy Romo, Mario Dantzler, and Daniel Carroll ("Correctional Officer Defendants")—are all employed by Milwaukee County at the Milwaukee County Jail. (*Id.* at ¶ 5.) Defendant Nurse Practitioner Brandon Decker was employed by Armor Correctional Health Services and at all times relevant to this case worked at the Milwaukee County Jail. (Docket # 15 at 1; Docket # 35 at ¶ 2.)

  2. *Events Involving the Nine Correctional Officer Defendants*

On October 20, 2017, Wade got into a fight with another inmate at the jail. (Correctional Officer Defendants' Proposed Findings of Fact ("DPFOF") ¶ 6, Docket # 41-1.) The fight started as a verbal altercation and escalated into a physical fight where correctional officers needed to forcibly separate Wade and the other inmate. (*Id.* ¶¶ 8–10.) Immediately after the fight, Wade was examined by Nurse Jackie.[4] (*Id.* at ¶ 12.) Nurse Jackie asked Wade about the pain and whether he could move his fingers. (Plaintiff's Response to DPFOF ("Response to DPFOF") ¶ 14, Docket # 58.) Wade asserts that he did not ask for an X-ray because he was told it was a sprain and thought he would be okay. (DPFOF ¶¶ 16–18; Response to DPFOF ¶¶ 16–18.) It is undisputed that Wade said, "I'm fine—it's just my hand," and Nurse Jackie cleared him to be released into unit 4D, which is a segregation unit. (DPFOF ¶¶ 11, 15, 18; Response to DPFOF ¶¶ 11, 15, 18.) To be released into unit 4D, policy required that Wade be cleared by medical personnel. (DPFOF ¶ 21.) At the time, Wade did not believe his hand pain constituted a medical emergency. (Deposition Tr. 21, Docket # 49-3 at 7.) At no point did Wade ask to go to the hospital or

---

[3] Neither party identifies Payne's first name.
[4] Not a defendant.

fill out a health services request (a "pink and white"). (Deposition Tr. 23, Docket # 49-3 at 8; DPFOF ¶¶ 11, 15; Response to DPFOF ¶¶ 11, 15.)

After his transfer to unit 4D, but still on October 20, 2017, Wade states that he complained to defendants Ericson, Dragoo, Spidell, and Payne about the pain in his hand. (Docket # 1 at 4–5.) According to Wade, Ericson stated that he couldn't do anything for him; Dragoo "went about his job as if [Wade] had said nothing"; Spidell told him a story about his own broken hand; and Payne stated that he would look into whether he could do something for Wade. (*Id.*; Deposition Tr. 73–74, Docket # 49-3 at 20–21.) The defendants stated that they do not recall whether Wade made requests for medical care that day. (Docket # 41-1 at ¶ 37.)

Wade was in unit 4D from October 20, 2017 to October 30, 2017. (Deposition Tr. 65, Docket # 49-3 at 18.) At no point did he request to go to the health services unit or fill out a "pink and white." (Deposition Tr. 22–25, Docket # 49-3 at 8.) However, he states that over the course of this ten-day period, he spoke to the nine Correctional Officer Defendants, telling them that there was something wrong with his hand. (Deposition Tr. 76–77, Docket # 49-3 at 21.) Of those nine defendants, Romo, Payne, and Carroll offered to look into or assist Wade with his hand in some way. (*Id.*) Wade stopped Romo, a "CERT officer," while she was in unit 4D and showed her his hand. (*Id.*) She stated that she would speak to the "pod officer." (*Id.*) Wade states that Payne told him he "would look into it for me." (*Id.*) Wade states that he talked to Carroll on October 28th asking him to follow up on whether Nurse Decker ordered an X-ray. (Deposition Tr. 30, Docket # 49-3 at 10.) Carroll stated that he would make some calls. (*Id.*) Two days later, Wade was taken to have his hand X-rayed. (Docket # 41-1 at ¶ 35.) As for Romo and Payne, Wade does not know what, if

3

anything, happened after they said they would look into things. (Deposition Tr. 78–79, Docket # 49-3 at 22.)

The other six Correctional Officer Defendants—Ericson, Spidell, Dragoo, Hintz, Santana, and Dantzler—did not offer to do anything. (*Id.*) Their interactions with Wade during this ten-day period were limited to letting Wade out for rec time. (Deposition Tr. 74–75, Docket # 49-3 at 21.) Wade notes that when they brought him out for recreational time, they had to use handcuffs and observed his hand. (*Id.*) Wade admits that he did not think the Correctional Officer Defendants were deliberately ignoring him or acting maliciously, but "just being lazy." (Deposition Tr. 78–79, Docket # 49-3 at 22.)

*3. Events Involving Nurse Practitioner Decker*

On October 25, 2017, Decker was conducting nursing rounds on unit 4D. (Deposition Tr. 25, Docket # 49-3 at 8.) Wade states that he stopped Decker and explained that he got in a fight a few days ago and his hand was discolored and swollen. (*Id.*) Decker looked at Wade's hand through the cell door window and told Wade, "I'm going to put in an X-ray order, and we'll get you down there soon." *Id.* Wade admits that he does not know whether Decker placed an order for an X-ray on October 25, 2017. (Response to Decker's Proposed Findings of Fact ("Response to Decker PFOF") ¶ 8, Docket # 57.) However, Wade contends that Decker should have sent him to the medical clinic that day and gotten him an X-ray immediately because it was a medical emergency. (*Id.* ¶¶ 15, 19.) It is undisputed that the X-ray was scheduled for October 26, 2017, and then was rescheduled because there was no available staff to transport Wade to the clinic. (*Id.* ¶ 25.)

4

*4. Wade's Diagnosis and Grievances*

Wade got an X-ray on October 30, 2017. (Deposition Tr. 30, Docket # 49-3 at 10.) The next day, Wade was diagnosed based on the X-ray with a "metacarpal neck fracture with angulation." (DPFOF ¶ 67.) Mild swelling was noted. (*Id.*) On November 2, 2017, Wade had an appointment with Nurse Practitioner Tia Medley (not a defendant) because he was experiencing pain, especially at night. (*Id.* ¶ 68; Docket # 1 at 6.) Wade was prescribed 800mg of Ibuprofen. (*Id.*) Wade took Ibuprofen from November 2, 2017 through November 16, 2017 for pain in his hand. (*Id.* ¶ 69.) Wade also asked Medley about his X-rays. (Docket # 1 at 6.) She was apparently surprised Wade had X-rays done but located the results and informed him he had a broken hand. (*Id.*) Apart from the Ibuprofen, no other treatment was recommended. (*Id.*)

In a grievance filed December 28, 2017, Wade complained that he did not have a follow-up appointment for his broken hand and that he was still in constant pain. (Docket # 48-7 at 25.) A nursing supervisor responded to the grievance and stated that a follow-up appointment had not occurred because Wade had not filed a form for follow-up health care. (*Id.* at 26.) A referral was placed for Wade to see a medical provider. (*Id.*)

Pursuant to this referral, Wade saw medical staff and was prescribed Ibuprofen on January 12, 2018. (DPFOF ¶ 75.) On February 23, 2018, he was taken to an outside provider, Dr. Anderson, who found that his fracture had healed. (Decker Proposed Findings of Fact ("Decker PFOF") ¶ 26, Docket # 35.) Dr. Anderson did not order any physical therapy and found no need for surgery. (*Id.* ¶¶ 26-27.) Wade was told to increase activity in his hand to improve his condition, and after February 27, 2018, Wade required no further treatment for his hand. (Response to Decker PFOF ¶¶ 28–29.) Wade states that he continues

5

to have pain in his pinky finger when he makes a fist, and his pinky and ring fingers hurt when he cracks his knuckles. (DPFOF ¶ 89.) Other than that, there appears to be no lasting injury. (*Id.* ¶ 91.)

Wade filed another grievance about the October 20, 2017 incident on March 3, 2018. (Docket # 48-7 at 36.) The grievance was returned to him because it was unclear what his complaint was. (*Id.* at 39.) Wade filed a follow-up grievance on March 12, 2018 stating that he was complaining that his injury went ignored and untreated for ten days. (*Id.*) A nurse responded to the grievance stating that they would speak with the nurses involved and work on effective communication. (*Id.* at 40.) Wade filed several other grievances between October 2017 and March 2018 unrelated to the events of October 20, 2017. (DPFOF ¶ 47.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its

burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Wade was a pre-trial detainee and not a convicted inmate at the time of the events at issue. Accordingly, the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause, applies to his claims. *See McCann v. Ogle Cty, Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). For claims of inadequate medical care, the standard is one of objective reasonableness rather than deliberate indifference. *Id.* A challenge to a pre-trial detainee's medical care proceeds in two steps. First, the court asks whether the defendants "acted purposefully, knowingly, or perhaps even recklessly" in handling the pre-trail detainee's medical issue. *Id.* A "showing of negligence or even gross negligence will not suffice." *Id.* Second, the court asks, "whether the challenged conduct was objectively unreasonable." *Id.* (quoting *Miranda v. Cty. of Lake*, 900 F.3d 335, 353–354 (7th Cir. 2018)). At this step, the court must "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.* While "jail staff may generally trust the [medical]

7

professionals to provide appropriate medical attention," officers can be liable where they "have reason to know that their medical staff were failing to treat or inadequately treat an inmate." *Miranda*, 900 F.3d at 343.

   1. *October 20, 2017: COs Ericson, Dragoo, Spidell, and Payne*

Wade claims that COs Ericson, Dragoo, Spidell, and Payne violated his constitutional rights on October 20, 2017 when they ignored his complaints about his hand pain after he was moved into unit 4D. However, the evidence in the record does not support a conclusion that their actions were objectively unreasonable. Wade had been examined by medical personnel earlier in the day, who had cleared him for release into unit 4D pursuant to jail policy that required medical clearance for placement in that unit. The COs were aware of this policy. (Docket # 41-1 ¶ 25.) Wade stated that, when he arrived at unit 4D, he himself did not believe that he was suffering from a medical emergency. (Deposition Tr. 21, Docket # 49-3 at 7.) Nothing in the record shows that Wade told Ericson, Dragoo, Spidell, or Payne that his hand was worsening or rising to the level of a medical emergency on the night of October 20. Wade alleged in his complaint and testified in his deposition that he complained about his hand to these four COs on October 20. (Docket #1 at 4-5; Deposition Tr. 21, 72-74, Docket #49-3 at 8, 19-21.) However, the record contains limited details of the nature of Wade's complaints. At best, there is evidence that Wade told Payne on the night of October 20 that his hand was hurting, swollen, and discolored. (Deposition Tr. 72, Docket #49-3 at 19). In response, Payne advised that Wade go see a nurse. (*Id.*) But it is undisputed that Wade did not ask to see a nurse or fill out the required form (the "pink and white") to request to go to the health services unit. On this evidence, even taken in the light

8

most favorable to Wade, no rational jury could conclude that any of these four COs was objectively unreasonable for failing to procure additional medical attention for Wade.

2. *October 20, 2017–October 30, 2017: All Correctional Officer Defendants*

Wade also claims that all the defendants violated his constitutional rights when they ignored his complaints about his hand during the ten-day period before Wade's X-ray. No rational jury could conclude that the actions of any of the nine COs during the ten-day period were objectively unreasonable. Regarding COs Hintz, Santana, Dantzler, Ericson, Spidell, and Dragoo, at most, Wade suggests that these COs should have noticed that his hand required medical attention when they handcuffed him to release him for recreational time. But there is no evidence that Wade's medical need should have been obvious to these officers. There is no indication that Wade ever made specific complaints to any of these officers about his hand. There is nothing in the record showing that Wade told these officers that his condition was worsening. There is no evidence of a request to see a nurse or go to the health services unit. In fact, there is nothing in the record that details his specific interactions with these officers during this time, so no reasonable jury could conclude that it was objectively unreasonable for the officers not to seek medical aid for Wade.

Regarding COs Romo, Payne, and Carroll, Wade alleges that he complained to them individually on separate occasions throughout the ten-day period about the pain and swelling of his hand. As discussed above, however, Wade has not alleged any facts that would allow a jury to conclude that these officials acted in a way that was objectively unreasonable. Not only had Wade been medically cleared to enter the unit, but Wade admits that nurses were in his unit four times a day and he saw them at least three times daily between October 20, 2017 and October 24, 2017. (DPFOF ¶¶ 53, 55, 59; Plaintiff's

9

Response to Defendant's Proposed Findings of Fact ("Response to DPFOF") ¶¶ 53, 55, 59 Docket # 58.) Wade admits that inmates could call to nurses on their rounds and speak with them unless the nurses were dealing with an emergency with another inmate. (DPFOF ¶ 58, Response to DPFOF ¶ 58.) Wade admits that he spoke with nursing staff on October 24, 2017 and October 25, 2017. (DPFOF ¶¶ 60, 61; Response to DPFOF ¶¶ 60, 61.) Although Wade asserts that his hand was swollen and discolored (Response to DPFOF ¶ 74), even if this is true, he has not presented evidence that the state of his hand had reached the level of an obvious medical emergency or clearly inadequate medical care by nursing staff such that a reasonable officer would have taken action. Wade admits that he never filled out the required form (the "pink and white") to request to go to the health services unit. (DPFOF ¶ 74, Response to DPFOF ¶ 74.) As Wade has not presented evidence on which a reasonable jury could conclude that any of the Correction Officer Defendants' actions towards Wade were objectively unreasonable, and I will grant summary judgment in their favor.

    3. *Actions of Nurse Practitioner Decker on October 25, 2017*

Finally, Wade claims that Decker violated his Fourteenth Amendment rights because he failed to immediately take Wade to the health clinic or send Wade for an X-ray on the same day that he examined him. But allegations of negligence, medical malpractice, or a disagreement with a medical judgment are "insufficient to support a claim for inadequate medical care." *McCann*, 909 F.3d at 887; *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Ordering "an X-ray or additional diagnostic techniques or forms of treatment . . . is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 439 U.S. 97, 107 (1976). Indeed, the Seventh Circuit has held that even the decision not to order an X-ray at all at most amounts to medical malpractice, and therefore is not actionable

under § 1983. *Jackson v. Kotter,* 541 F.3d 688, 698 (7th Cir. 2008). Decker informed Wade on October 25, 2017 that he would get an X-ray "soon." (Deposition Tr. 25:18-19, Docket # 49-3 at 8.) Decker made a professional judgement that a visit to the health clinic or an X-ray was not immediately necessary, which is legally insufficient to support a claim against Decker. Furthermore, the medical records show that Decker put in an order for the X-ray on the same day that he spoke with Wade. (Docket # 49-2 at 12.) Wade admits that there is no evidence that Decker had any control over when Wade received the X-ray after that. (Response to Decker PFOF ¶ 12.) Because Wade has not presented evidence on which a rational jury could find that Decker's actions were unreasonably objective, I will grant summary judgment in Decker's favor.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendants' motions for summary judgment (Docket # 34, Docket # 40) are **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under

Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 15th day of January, 2020.

BY THE COURT:

s/*Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge